# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES | CRIMINAL ACTION |
|---|---|
| v. | |
| ANTHONY CANN | NO. 16-309 |

DuBois, J.                                                                                                                                              May 3, 2017

## **M E M O R A N D U M**

### I. INTRODUCTION

Defendant Anthony Cann is charged in an Indictment with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Defendant moved to suppress physical evidence, a Smith & Wesson, Model 60, 357 Magnum Revolver, loaded with five rounds of live ammunition, recovered from the pocket of his pants. An evidentiary hearing and oral argument on the Motion to Suppress Physical Evidence ("Motion to Suppress") were held on April 28, 2017. For the reasons stated below, the Motion to Suppress is denied.

### II. FACTS[1]

On the evening of May 7, 2016, Philadelphia Police Officers Ryan Daut and William Murphy ("the officers") were on patrol in a marked police vehicle. Hr'g Tr. 5:2–7, 49:21–50:11. Shortly before midnight, the officers observed a silver Mercury Grand Marquis fail to stop at a stop sign at the intersection of 57th and Thompson Streets. Hr'g Tr. 5:13–25, 50:12–16. The officers also observed a crack that ran nearly the full width of the vehicle's windshield. Hr'g Tr. 5:20–6:1, 6:9–18, 51:4–10. Based on these two traffic violations, the officers activated the patrol car's overhead lights and siren and conducted a vehicle stop. Hr'g Tr. 6:16–22, 51:17–20.

---

[1] The factual background is taken from the evidence presented at the April 28, 2017, hearing.

The officers approached the vehicle after it stopped. Hr'g Tr. 7:4–6, 51:21–52:4. Daut approached the driver side of the vehicle, and on approach, observed its two occupants "moving around a lot inside the vehicle" and noticed the passenger—later identified as Cann—appear to "lift[] his body up" off of the seat. Hr'g Tr. 7:12–8:2. As Murphy approached the passenger side of the vehicle, he observed "the driver and [Cann] fidgeting around." Hr'g Tr. 51:21–52:2. When Daut reached the vehicle, he used a flashlight to illuminate the inside of the car. Hr'g Tr. 9:22–24. At that time, Daut observed Cann leaning toward the passenger door and "doing something on his side near his right pant pocket or right hip area," as if Cann was "trying to push something deeper into his pocket" or "trying to conceal something." Hr'g Tr. 8:21–9:17. Murphy also noticed Cann move his right hand "to the right side to adjust something." Hr'g Tr. 55:3–13. When Murphy reached the passenger side door, Cann "just star[ed] straight ahead" and did not make eye contact with Murphy. Hr'g Tr. 53:19–54:5. Although Daut was focused on the driver, he noticed that Cann "wasn't making eye contact" with Murphy. Hr'g Tr. 8:21–25. When Murphy asked Cann for his identification, Cann "asked why," but within 45 seconds, he produced his identification. Hr'g Tr. 55:3–23, 56:15–57:10. Both officers detected the odor of burnt marijuana coming from inside the vehicle. Hr'g Tr. 10:9–12, 27:18–20, 53:19–54:8.

The officers collected identification from the driver and Cann, and returned to their police vehicle to run the occupants' information through the police computer system. Hr'g Tr. 10:24–11:3. As they waited for the results, the officers observed both occupants moving around in the vehicle and looking back toward the police vehicle. Hr'g Tr.11:16–12:3, 57:11–21. Daut eventually learned from the computer system that Cann had a "scofflaw violation [warrant] for two [unpaid] tickets." Hr'g Tr. 12:4–13.

The officers then approached the vehicle for a second time. Hr'g Tr. 12:14–12:17, 58:8–11. Daut approached the driver side of the vehicle, and again used a flashlight; Murphy approached the passenger side. Hr'g Tr. 13:5–7, 14:22–24, 26:17–20, 58:8–11. Daut then informed Cann that he had a scofflaw violation. Hr'g Tr. 13:5–9. In response, Cann "began raising his voice," "yelling very loudly," and "cursed a couple of times." Hr'g Tr. 13:10–16, 46:8–15. Daut then noticed "a large object in [Cann's] pocket consistent with possibly a firearm" in the same pocket that he saw Cann touching when Daut first approached the vehicle. Hr'g Tr. 14:9–17, 15:3–5, 46:16–27:6. At that point, based on the bulge in Cann's pocket, Cann's earlier movements near his right pocket, the odor of marijuana, and Cann's "irateness," Daut formed a belief that Cann "was in possession of something that could have harmed [him] or [his] partner." Hr'g Tr. 15:6–16. Daut immediately signaled to Murphy, over the top of the car, that Murphy should "take [Cann] out of the vehicle." Hr'g Tr. 15:6–9, 58:8–16.

Murphy asked Cann to step out of the vehicle twice, and Cann did not comply. Hr'g Tr. 58:8–19, 59:1–9. Although Daut was "focused on the driver," he noticed that Murphy "had to give multiple orders" to Cann to exit the vehicle. Hr'g Tr. 15:20–16:1. Murphy then opened the passenger door and told Cann to step out, and Cann did so. Hr'g Tr. 58:19–23, 59:1–11. After exiting the vehicle, Cann assumed a "bladed stance," with the right side of his body pressed against the doorjam of the passenger door, and the left side of his body pointed toward Murphy. Hr'g Tr. 58:20–23. This stance hid the right side of Cann's body, including his entire right arm, from Murphy's view. Hr'g Tr. 59:21–60:2, 82:25–83:6. According to Murphy, a bladed stance is "unusual," and based on his "experience and knowledge," a person who uses such a stance is "blading for a reason." Hr'g Tr. 81:8–82:5. Murphy then asked Cann to place his hands on top of the car. Hr'g Tr. 60:3–7. Cann instead pushed Murphy's chest with his left hand. Hr'g Tr.

3

61:6–12.  A struggle ensued, during which Murphy attempted to get Cann's hands on top of the car.  During the struggle Murphy noticed the handle of a gun "sticking out of [Cann's] front right [pants] pocket."  Hr'g Tr. 61:13–62:9.

At some point during the struggle, Murphy yelled "gun," and Daut ran over to assist Murphy.  Hr'g Tr. 16:4–15, 60:10.  The officers handcuffed Cann, and recovered a Smith & Wesson, Model 60, 357 Magnum Revolver, loaded with five rounds of live ammunition from Cann's front right pants pocket.  Hr'g Tr. 16:21–17:9, 60:12–13, 62:15–22.  Cann did not have a license or permit to carry a firearm.  Hr'g Tr. 63:3–64:8.  Cann was arrested for a weapons violation, and pursuant to police department policy, no traffic violation ticket was issued.[2]  Hr'g Tr. 17:12–21, 64:13–14.

On August 2, 2016, a Grand Jury returned an Indictment charging Cann with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  On March, 17, 2017, Cann filed a Motion to Suppress the physical evidence against him.  On April 28, 2017, the Court held a hearing on the Motion.

**III.  LEGAL STANDARD**

As a general rule, the burden of proof is on a defendant who seeks to suppress evidence.  *Unites States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  However, once the defendant has established a basis for his motion, such as establishing that the search or seizure was conducted without a warrant, "the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable."  *United States v.*

---

[2] Although no ticket was issued for the motor vehicle violations, the Vehicle / Pedestrian Investigation Report, under "Reason for Stop," notes that the vehicle had a "large crack going horizontally across the entire windshield" and that the vehicle "disregarded the stop sign," both motor vehicle violations.  Hr'g Tr. 20:7–21:11; Gov. Ex. 1, Vehicle / Pedestrian Investigation Report (Form 75-48A).

*Ritter*, 416 F.3d 256, 261 (3d Cir. 2002). The applicable burden of proof is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

**IV. DISCUSSION**

For Fourth Amendment purposes, the interaction between Cann and the officers can be divided into three stages: (1) the traffic stop, (2) the order to exit the vehicle, and (3) the discovery of the firearm. The Court concludes that the traffic stop, the order to exit the vehicle, and the discovery of the firearm were all lawful.

1. <u>The Initial Traffic Stop</u>

The officers initially stopped the vehicle in which Cann was a passenger because they observed the vehicle fail to completely stop at a stop sign, and because the vehicle had a large crack in its windshield. "It is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997). "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).

In this case, the Court finds that the vehicle in which Cann was a passenger was stopped for two traffic violations: the driver failed to obey a stop sign, and the vehicle had a large crack in its windshield. Although the driver was not issued a traffic citation, that decision was made pursuant to a written Philadelphia Police Department policy that precludes issuance of traffic citations if an individual is subsequently arrested for a criminal violation. The Officers testified that the two traffic code violations prompted the initial stop, and the Court credits that testimony. The two violations were also recorded in the Officers' report. Thus, the initial traffic stop was lawful under the Fourth Amendment.

5

2. The Order to Exit the Vehicle

After the officers ran a check on the identification provided by the driver and Cann, the officers returned to the vehicle. After further observation of Cann, during which Daut saw a large bulge in Cann's pocket, leading Daut to conclude Cann was in possession of something that could harm him or Murphy, Daut signaled to Murphy to order Cann out of the vehicle, and Murphy did so. Cann argues that Murphy's instruction that Cann exit the vehicle is unlawful because at that point, the Officers had finished dealing with the traffic violations, and therefore the traffic stop had concluded. The Court rejects this argument.

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). However, a police officer executing a traffic stop may exercise "reasonable superintendence" over the vehicle and its passengers. *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004). For example, an officer may order a passenger out of the vehicle during a traffic stop without any particularized suspicion. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Applying the law to the facts of this case, the Court concludes that Murphy's directive to Cann to exit the vehicle did not violate the Fourth Amendment.

The only evidence to support the argument that the traffic stop had concluded is the officers' testimony that as they returned to the vehicle, their subjective intent was to return Cann's and the driver's identification. Hr'g Tr. 38:11–39:2, 70:1–4. But during a traffic stop, a police officer is justified in asking the driver or passenger to step out of the vehicle even *after* issuing a verbal warning for the violation and returning individual's identification. *Ohio v. Robinette*, 519 U.S. 33, 38 (1996) ("[T]here is no question that, in light of the admitted probable

6

cause to stop Robinette for speeding, Deputy Newsome was objectively justified in asking Robinette to get out of the car, subjective thoughts [e.g., ulterior motives] notwithstanding."). Therefore, because Murphy had probable cause to stop the vehicle based on two observed traffic violations, Murphy was justified in asking Cann to step out of the vehicle.

      3. <u>The Discovery of the Firearm</u>

After Cann exited the vehicle, Murphy asked Cann to place his hands on top of the car. Cann did not do so. Instead, Cann pushed Murphy, a struggle ensued, and Murphy observed the handle of a gun protruding from Cann's right pants pocket.

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Horton v. California*, 496 U.S. 128, 134 (1990). For the plain view doctrine to apply, three elements must be satisfied:

> (1) the officer [must] not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed;
> (2) the object's incriminating character must also be immediately apparent; and
> (3) the officer must also have a lawful right of access to the object itself.

*United States v. Hawkins*, 646 F. App'x 254, 256 (3d Cir. 2016). For example, the plain view doctrine has been applied to deny a motion to suppress when an officer "observed a metallic object protruding from a jacket on the kitchen floor [which he] immediately recognized . . . as a gun." *United States v. Sabur*, No. 04-CR-0264, 2005 WL 2340701, at *2, 4–5 (E.D. Pa. Sept. 22, 2005).

The plain view exception applies in this case. Under the first element, the Court concludes that Murphy's actions leading up to his observation of the handle of the firearm were lawful. As discussed *supra*, the stop itself was lawful, as was Murphy's order that Cann exit the vehicle. After exiting the vehicle, Murphy instructed Cann to place his hands on top of the vehicle. Cann did not do so. Instead, Cann pushed Murphy's chest, and a brief struggle ensued,

7

during which Murphy attempted to restrain Cann. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person, and the Fourth Amendment requires that the seizure be reasonable." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). The Court concludes that Murphy's use of minimal force in response to Cann's own use of force was reasonable. Therefore, all of Murphy's actions leading to his observation of the handle of the firearm in plain view complied with the Fourth Amendment.

Second, Murphy testified that he immediately recognized the object as the handle of a firearm. Although a firearm is not necessarily incriminating, a person's attempt to hide a gun can make its incriminating character "immediately apparent." *United States v. Karriem*, No. CRIM. 07-706 (HAA), 2008 WL 5118200, at *5 (D.N.J. Dec. 4, 2008); *United States v. Mosley*, No. CR.A. 01-664, 2002 WL 32351168, at *3 (E.D. Pa. Sept. 18, 2002). Murphy testified that he observed Cann use his right hand to "adjust something" during their first interaction. And after Cann exited the vehicle, Cann stood in an unusual bladed stance that kept the right side of his body, including his right arm, hidden from Murphy's view. These actions rendered the incriminating character of the firearm immediately apparent when Murphy observed it.

Third, Murphy had a lawful right of access to the firearm. "In the particular context of a lawful traffic stop, a police officer has a 'lawful right of access' to seize an incriminating object in the officer's plain view during the stop." *United States v. Orr*, No. 1:06 CR 00050, 2006 WL 2521338, at *5 (M.D. Pa. Aug. 29, 2006) (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)). Therefore, the seizure of the firearm was constitutional under the plain view doctrine.

V. **CONCLUSION**

For the foregoing reasons, the Court denies defendant Anthony Cann's Motion to Suppress Physical Evidence. An appropriate order follows.